# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

_____

**RONALD CHALMERS,**
**LINDA CHALMERS,**
**CHELSEY CHALMERS and**
**SHANNON CHALMERS**
**767 N. Wisconsin Street**
**Port Washington, WI  53074**

                  **Plaintiffs,**

      **-vs-**

**OZAUKEE COUNTY**                               **Case No.:_____**
**121 W. Main**
**Port Washington, WI  53074,**

**OZAUKEE COUNTY**
**DEPARTMENT OF HUMAN SERVICES**
**121 W. Main**
**Port Washington, WI  53074,**

**ROBERT HAUPT,**
**DIRECTOR OF OZAUKEE COUNTY**
**DEPARTMENT OF HUMAN SERVICES**
**121 W. Main**
**Port Washington, WI  53074,**

**MARIAN BALLOS**
**121 W. Main**
**Port Washington, WI  53074,**

**MOLLY  MCCONEGHY HUBBELL**
**121 W. Main**
**Port Washington, WI  53074,**

**KATHRYN FEIERTAG**
**121 W. Main**
**Port Washington, WI  53074,**

**KIMBERLY QUAM**
**121 W. Main**
**Port Washington, WI 53074,**

                    **Defendants.**
_____

# COMPLAINT
_____

      **NOW COME** the above named plaintiffs, by their attorney, DANIEL W. STEVENS, of

STEVENS & KUSS S.C., and as and for a cause of action against the above named defendants,

alleges and shows to the Court as follows:

## JURISDICTION AND VENUE

      1.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§1331 (federal

question jurisdiction) and 1343(a)(3) (42 U.S.C. §1983 jurisdiction).

      2.     The Eastern District of Wisconsin is the proper venue for this action because the

plaintiffs' claims arose in Ozaukee County, which is within the geographical boundaries of the

Easter District of Wisconsin within the meaning of 28 U.S.C. § 1391(b).

## PARTIES

      3.     That, RONALD CHALMERS, is an adult residing at 767 N. Wisconsin Street,

Port Washington, WI 53074.

      4.     That, LINDA CHALMERS, is an adult residing at 767 N. Wisconsin Street, Port

Washington, WI 53074.

      5.     That, CHELSEY CHALMERS, is an adult residing at 767 N. Wisconsin Street,

Port Washington, WI 53074.

      6.     That, SHANNON CHALMERS, is an adult residing at 767 N. Wisconsin Street,

Port Washington, WI 53074.

2

7. That, OZAUKEE COUNTY, is a government agency and is made a party to this action because they were directly involved in the actions, decision making, formulating of the policies and procedures which resulted in the violation of the plaintiffs' Fourth and Fourteenth Amendment Constitutional Rights.

8. That, OZAUKEE COUNTY DEPARTMENT OF HUMAN SERVICES (hereinafter DHS), upon information and belief, is a government agency operated by OZAUKEE COUNTY and is made a party to this action because they were directly involved in the actions, decision making, formulating of the policies and procedures which resulted in the violation of the plaintiffs' Fourth and Fourteenth Amendment Constitutional Rights.

9. That, ROBERT HAUPT (hereinafter HAUPT), Director of Ozaukee Department of Human Services, both in his individual capacity and official capacity as an employee of Ozaukee county is made a party to this action because he was directly involved in the actions and decision making which resulted in the violation of the plaintiffs' Fourth and Fourteenth Amendment Constitutions Rights.

10. That, MARIAN BALLOS (hereinafter BALLOS), both in her individual capacity and official capacity as an officer, agent, and employee of Ozaukee County is made a party to this action because she was directly involved in the actions and decision making which resulted in the violation of the plaintiffs' Fourth and Fourteenth Amendment Constitutional Rights.

11. That, MOLLY MCCONEGHY HUBBELL (hereinafter HUBBELL), both in her individual capacity and official capacity as an officer, agent, and employee of Ozaukee County, acting under color of State Law and at all times relevant to this matter is made a party to this action because she was directly involved in the actions and decision making which resulted in the violation of the plaintiffs' Fourth and Fourteenth Amendment Constitutional Rights.

3

12.     That, KATHRYN FEIERTAG (hereinafter FEIERTAG), both in her individual capacity and official capacity as an officer, agent, and employee of Ozaukee county is made a party to this action because she was directly involved in the actions and decision making which resulted in the violation of the plaintiffs' Fourth and Fourteenth Amendment Constitutional Rights.

13.     That, KIMBERLY QUAM (hereinafter QUAM), both in her individual capacity and official capacity as an officer, agent, and employee of Ozaukee county is made a party to this action because she was directly involved in the actions and decision making which resulted in the violation of the plaintiffs' Fourth and Fourteenth Amendment Constitutional Rights.

14.     Plaintiffs are informed and believe and on such a basis allege that each of the above named parties was and is the agent, employee, principal, or employer of each of the remaining defendants and/or vice versa.  In addition, Plaintiffs are informed and believe and on such basis allege that the defendants named hereinabove, and each of them, are responsible in some manner for the occurrences herein alleged, and that each of the above named defendants conspired with, and/or aided and/or abetted each of the remaining defendants in committing the acts herein alleged.

15.     Plaintiffs are informed and believe and on such basis alleges that each of the above named defendants was acting under color of law in committing the acts herein alleged, and that in doing the things herein alleged defendants, and each of them, were acting within the course and scope of their duties as employees or agents of the Ozaukee County Human Services Agency, and that each of the above named individuals voluntarily collaborated with each of the remaining defendants in violating Plaintiffs' Fourth and Fourteenth Amendment rights as alleged in greater detail herein-below

4

16.     Plaintiffs are informed and believe and on such basis allege that at all relevant times, Defendants, and each of them, were the knowing agents and/or alter egos of one another, and that Defendants directed, ratified, and/or approved the conduct of each of the other. Defendants, and each of their agents or employees, and are therefore vicariously liable for the acts and omissions of their co-defendants, their agents and employees, as more fully alleged herein.  Moreover, all of the Defendants agreed upon, approved, ratified, and/or conspired to commit all of the acts and/or omissions alleged in this Complaint.

## COMMON ALLEGATIONS

17.     PLAINTIFFS RON and LINDA CHALMERS were married in 1995. PLAINTIFFS SHANNON and CHELSEY are the natural children of RON and LINDA.

18.     RON and LINDA moved to Port Washington in 1987, and have resided there since.  The children were raised in their current residence since 1999.  The family is well known and well respected in their business, the church, and the community.  RON has been a General Contractor and a Master Carpenter in the remodeling business for 30+ years. LINDA has been a small business operator for 20 years, and has been a Realtor with Coldwell Banker Residential Brokerage since 2000.

19.     RON and LINDA are deeply committed and devoted parents.  Their choice to have children was both conscious and intentional.  They arranged their work life around their family because they were grateful to have the privilege to interact with their children through adolescence and into adulthood.

20.     They were/are loving and nurturing parents.  They strived to be the best role models for their children that they were capable of, and they share an extremely close connection

5

with their children through play, work, instruction, discipline, and involvement in the children's activities. Their children thrived in this environment. Prior to the Defendants unwarranted intervention, SHANNON was a senior in high school, had been a dancer for over 10 years, and was planning on opening her own studio after graduation. She was an assistant manager of a local restaurant, a "Big Sister" for *Big Brothers, Big Sisters of Ozaukee County*, and a volunteer at the Humane Society**.** CHELSEY was also a senior in high school (due to graduate 2 years early), she too had danced for over 10 years, and was a student teacher at the dance studio. She was an accomplished violinist, had just been promoted to Captain of the *Explorers* (volunteer junior fire fighter), and just received a promotion to Crew Chief position at McDonald's where she had worked for over a year. Colten was just beginning his Sophomore year in high school. He was a cadet in the Civil Air Patrol. He loved baseball, football, and basketball. He was a natural athlete, an artist, and on the honor roll. The children were happy overachievers.

21.     Then, on Colten's 15th Birthday, July 6, 2010, at approximately 11am, Social Services Agent MOLLY HUBBELL accompanied by a police officer appeared at the residence uninvited. The family was in the process of remodeling their home. The home was open and all of the family members including Colten were working together. This visit by HUBBELL was done without notice or consent, and was not done pursuant to a court order or exigent circumstances. HUBBELL asserted that she be allowed to interview Colten privately, as the department supposedly had received "reports" from unknown sources. The family acquiesced with the request believing they had nothing to hide. Colten was then interrogated by HUBBELL and the officer, outside the presence of the family for between half an hour to an hour.

22.     HUBBELL and the officer then questioned RON and LINDA regarding the department's concerns due to the "reports" they had received from unknown sources.

6

HUBBELL refused to disclose who these sources were. (It was later discovered that these sources were in actuality Colten's biological family, whose rights had been terminated due to substance abuse and abandonment). These sources were envious of the close family relationship Colten established with his adopted family. HUBBELL told RON and LINDA there were rumors that Colten was being deprived of food, made to stay in his room, isolated from friends, called "stupid," and that he was made to stay in the basement when no one was home. The police officer profusely apologized after being assured by Colten, RON, and LINDA that these allegations had no basis in reality, and a tour of the home, as well as the basement, proved the allegations false. HUBBELL appeared to agree with the officer and said that she would mail her findings in the next few weeks. No services were offered, suggested, or needed. No one else was interviewed, even though all family members were home at the time. The police report confirmed everyone's opinion at the time stating "**The conclusion of the interview determined that this is unfounded and it was not believed that any of the allegations are true**."

23.     The family enjoyed the rest of the summer working together on the addition except for breaks to spend time at the cottage, fishing, swimming, tubing, water-skiing, attending the local fairs and fests, and enjoying each other's company. All had forgotten the intrusion of HUBBELL. There was no further follow up from HUBBELL or any of the defendants until September.

24.     School began, and everyone was adjusting to the new schedule. Then on September 7, CHELSEY told her parents "that lady," HUBBELL, stopped in to work to question her. She said that HUBBELL probed as to how things were going at home. She said that HUBBELL would be calling her mother tomorrow. This interrogation was without permission, a warrant, court order, or exigent circumstances. Having heard CHELSEY mention this, Colten

7

then told his parents "yeah, she was at my school today to talk to me too." He said she queried him how his summer went.

25. In fact, earlier that day, Social Services Agent HUBBELL arrived at Colten's high school. Removing him from class, Colten was again interrogated and asked numerous questions invasive of Plaintiffs' familial privacy, without permission, a warrant, court order, or exigent circumstances. HUBBELL made no effort to provide any advance notice to any of the plaintiffs, in order to obtain their consent, nor did she obtain a warrant, nor were there any exigent circumstances or any basis to believe immediate intervention was necessary.

26. HUBBELL did not have parental authorization, a warrant, a court order, or exigent circumstances authorizing her to conduct such an interrogation outside of the presence of Colten's parents, RON or LINDA. This was a preplanned interrogation by both HUBBELL and Supervisor BALLOS, so the defendants would have had time to get a court order or warrant if there had been any legal justification for their actions.

27. That same day, CHELSEY was also confronted by HUBBELL at her place of employment. Though there were never any accusations involving CHELSEY, she was nevertheless interrogated in HUBBELL's "fishing expedition" looking for a possible basis to remove her. CHELSEY was also interrogated, asked numerous questions invasive of Plaintiffs' familial privacy, without the parent's consent, a warrant, court order, or exigent circumstances. CHELSEY was forced to stop work at that point amid questions from co-workers. She had to request permission from her manager to talk to HUBBELL. HUBBELL took CHELSEY outside, by a public side entrance door of McDonald's. The interrogation continued for approximately 10-20 minutes.

28.     HUBBELL falsely informed both children that she would contact their parents later that day or the next day expressly for the purpose of coercing cooperation from the children. That in order to induce cooperation with the children, HUBBELL informed them that she would likely suggest family counseling to help better communication between parents and children. HUBBELL failed to inform the children that she planned to remove them to a setting where the parents would have little or no contact with them or input into their day-to-day activities, or they with their parents and sister. Both children were misinformed as to the nature of their interrogation and HUBBELL's purposes behind the interrogation. HUBBELL's clear purpose was to build a case for removing Colten and CHELSEA, and she displayed intentional disregard for maintaining the family integrity or protecting the family autonomy.

29.     LINDA called HUBBELL three times the following day for an explanation for her questionable practices. HUBBELL did not return her calls.

30.     On September 8, 2010, the next day, without contacting the parents, HUBBELL arrived at the high school attended by Colten. Without consent, without a court order, without there being exigent circumstances, probable cause, or any evidence of imminent danger, and with deliberate indifference to the rights of the family, HUBBELL seized Colten from his High School after presenting school officials with a Temporary Physical Custody Request (TRCR.) HUBBELL had no warrant or court order giving her authority to do this.

31.     That HUBBELL, on that same day, without contacting the parents  then proceeded to McDonald's where CHELSEY was working, seized her also, and removed her and Colten to foster care. Again, this action was without consent, without a court order or warrant, and with deliberate disregard of the rights of the family. DEFENDANTS had no probable cause, evidence of imminent danger, or exigent circumstances to support their decision. When

9

CHELSEY asked HUBBELL why she was being forced into foster placement, HUBBELL refused to answer and deceptively changed the subject.

32.     Exigent circumstances for removal did not exist as there existed no reasonable basis for believing that either CHELSEY or Colten were at risk or in any danger within the time it would have taken to obtain a warrant.  This warrantless seizure occurred after HUBBELL interviewed RON, LINDA, and Colten on July 6, 2010. In fact, HUBBELL and SUPERVISOR BALLOS held a number of meetings since July 6, where they discussed and planned the unlawful seizure of the children.  The removal served to prevent Colten from attending a Brewer's Baseball game that evening with his dad.

33.     After the removal of the children, HUBBELL then proceeded to the family home. At approximately 3:45pm, the parents, expecting their son any minute from school, were instead approached by HUBBELL, again accompanied by a police officer.  HUBBELL produced a "document" which she handed to LINDA, stating that the children were placed in foster care. HUBBELL was visibly hostile toward both LINDA and RON.  She refused to answer any questions.  The parents reasserted to HUBBELL that the children were never in any danger. RON asked about taking Colten to the baseball game that night as they had tickets.  Colten had been looking forward to this special event for some time.  HUBBELL then sarcastically commented that Colten was very upset because he would be unable to go to the baseball game that evening with his dad, but that obviously he would have to miss the game.  HUBBELL then threatened the parents that any attempt to contact the children would result in parents' arrest. She asserted that both Colten's school and CHELSEY'S employer had been ordered to call the police should the parents make an attempt to see their children.  These actions by HUBBELL are

a violation of the family's rights, defamatory and stigmatizing of the parents and children. It was also embarrassing and humiliating to the entire family and slanderous.

34. The remaining family members were devastated and frantic. They could not contact their children to reassure them. The TPCR served was NOT a warrant or court order, and was completed with deliberate indifference to the rights of the family. The wording was vague, indefinite, and did not allege any abuse or circumstances justifying removal. Based upon this document the parents could not adequately prepare for or in any way defend against allegations that were nonspecific and abstract. This conduct violated PLAINTIFFS constitutional due process rights and their right to familial association under the Fourth and Fourteenth Amendment. In the TPCR, HUBBELL never stated a reason for removal or denial of contact, and stated orally that she would inform the parents when and what time they should appear in court. She handed them a business card to contact her for the date and time of the hearing.

35. Prior to their removal on September 8, 2010, CHELSEY and Colten were in no danger and were safe and secure in their home under the care and control of their parents.

36. The seizure of Colten and CHELSEY was extremely traumatic and emotionally disturbing to all the family. Exigent circumstances for removal did not exist and there existed no reasonable basis for believing that either CHELSEY or Colten was in imminent danger of suffering death, serious bodily injury, or any harm at all under Wisconsin Law within the time it would take to obtain a warrant. The Defendants unilaterally decided to place the children in foster care with an older sibling of Colten's who made up rumors of abuse, and had personal reasons for wanting to disrupt the family and obtain permanent custody of at least Colten for herself. Her motives were never investigated nor challenged by any of the defendants.

11

37.     Records indicate that DEFENDANTS held numerous meetings prior to this date where they collaborated, planned, and conspired to seize the children of the family.  Despite knowing that CHELSEY and Colten were in no immediate danger HUBBELL continued with the seizure of Colten and CHELSEY, and with reckless disregard for the truth.

38.     The subsequent CHIPS petition and other court documents contradict the allegations in the sham TPCR.

39.     The sham TPCR contained false defamatory statements stigmatizing, humiliating, and embarrassing both parents and children amounting to defamation.  This was a Custody request, not a court order or warrant, and, upon information and belief, it was never filed.

40.     The parents were not contacted to inform them of the date and time of the placement hearing.  LINDA had to call HUBBELL.  At that time LINDA was informed that the children needed clothes.  LINDA did not understand why they should bring clothes as she truly believed that the children would be coming home after the hearing.

41.     The Placement Hearing was heard two days later on September 10, before Judge Sandy Williams, without CHELSEY or Colten present.

42.     HUBBELL'S report to the court contained material and substantial misrepresentations of fact, and excluded relevant information.  That DHS, through its social worker HUBBELL, in collaboration with other defendants, under the supervision of BALLOS, knowingly and intentionally gave false and misleading information to the court with the expectation and intent that the court would rely on this information in issuing an order authorizing the continued seizure of CHELSEY and Colten.

43.     When the court asked HUBBELL whether reasonable efforts were made to keep the children in the home, HUBBELL lied to the Court stating that the parents were

12

uncooperative, when in truth and in fact **NO** efforts whatsoever were made to preserve the family. HUBBELL'S verified petition contained statements therein that were false, either directly or by omission of critical exculpatory facts. These include allegations that the children were at risk or in danger. HUBBELL did not care whether the allegations were true or false, and made no effort, herself, to find out or otherwise investigate the truth of the matters stated, thereby demonstrating a reckless or callous indifference to the rights of PLAINTIFFS and of her duty to tell the truth.

44. Despite her knowledge of the true circumstances, HUBBELL lied to the juvenile court at the placement hearing stating that LINDA and RON denied services that were offered by the Defendants, when in fact, no one had made contact with the parents whatsoever between the time of the original interrogation on July 6th, up through when the children were seized and the initial hearing.

45. In truth and in fact, the parents, when approached on July 6, 2010 had been appropriate and cooperative with DHS's so called "investigation." HUBBELL made no attempts via phone, mail, or in person to further "investigate" or offer services. None of the defendants made contact with the parents whatsoever between the time the children were seized and the initial hearing. The parents were forced to call in order to know the date and time of the hearing at which time they were informed that the children needed clothing. This shocked both parents as they knew they had done nothing wrong and truly believed that the children would be coming home after the hearing. Neither HUBBELL nor any of the other defendants did anything to verify the false allegations made by the older sibling who instigated the investigation. There were no other relatives, health care providers, teachers, counselors or other professionals who ever supported the false allegations of the older sibling.

13

46. That, during this hearing, the attorney for the family requested that HUBBELL provide the specific legal basis for the removal of the children as required by Wisconsin Statutes. Neither HUBBELL nor anyone from DHS was able to provide a legal basis for the seizure of the children. The explanation offered by HUBBELL and the DHS was that there was, "an ongoing investigation." The court continued the hearing until the following Wednesday, September 15th. During this time RON, LINDA, and SHANNON were told by HUBBELL, through their attorney, that they were not allowed to contact CHELSEY or Colten, or have the children in any way contact the parents or their sister SHANNON. During this time the children were placed with the complaining foster parent who had an agenda desiring to alienate the children from their parents. Despite the successful alienation and brainwashing by the older sibling none of the defendants ever agreed to place the children in a neutral home.

47. Prior to the continued hearing, HUBBELL met with Colten at his school for the purposes of signing a CHIPS petition. Colten was provided no legal counsel when coerced into signing this petition. The petition was not based upon exigent circumstances, probable cause, consent, or court order, and was not justified based upon any of the allegations that had been exaggerated up to this point in time. With reference to the petition Colten later stated "those were not my words."

48. HUBBELL then met CHELSEY in McDonald's parking lot in a van prior to the hearing for the purposes of coercing her into signing a CHIPS petition, again, providing no legal counsel to CHELSEY. The petition was not based upon exigent circumstances, probable cause, consent, or court order, and was not justified based upon any of the allegations of which had been exaggerated up to this point in time. This meeting was done without the consent of the

14

parents, court order, probable cause, or exigent circumstances. And CHELSEY later stated with reference to the petition "those were not my words."

49. At the second hearing HUBBELL and DHS presented the Court with both CHIPS petitions based on statements that HUBBELL and the DEPARTMENT knew to be false or exaggerated. The statements contained in these petitions were distortions of statements attributed to CHELSEY and Colten that did not accurately reflect what they had stated.

50. Again RON and LINDA were told by the HUBBELL and BALLOS to have no contact with the children and the children were prohibited from having contact with the parents. The children were denied the parents' reassurance, nurturing and support. This was never said in court and, upon information and belief, the court was unaware of the defendants' plan to keep the parents isolated from their children. During this time the foster care provider, the older sibling, was working to alienate the children from their parents.

51. The parents' attorney left messages after court with HUBBELL to contact him to discuss a visitation schedule for the family. HUBBELL refused to return his calls.

52. On September 12, 2010, SHANNON took clothes up to her sister and brother (CHELSEY and Colten), in foster care. SHANNON was unaware that the "no contact" order applied to her. SHANNON was told by the foster parent that she was not allowed to speak with CHELSEY or Colten, and to remind the parents that there was still no contact with the kids. SHANNON was devastated and confused. SHANNON, along with her parents, did not understand how any of this was happening. SHANNON had never been approached by DHS with any questions at any time. SHANNON had just turned 18 in August and still lived at home. She had shared a room and a life with CHELSEY for the last 16 years. SHANNON never felt that her parents were abusive, or saw any reason why someone would remove her sister and

15

brother from their house. The foster caretakers searched all belongings to make sure there were no notes from the family, which would interfere with the older siblings' purpose of alienating the children.

53.     On September 16, 2010, LINDA received a phone call from HUBBELL (she had still not responded to any of the family's attorneys' phone calls), asking for a signature on medical release forms for mental health purposes, a signature for CHELSEY'S Driver's Ed course, and access to CHELSEY'S bank account. LINDA informed HUBBELL that she needed more information prior to signing these forms, and asked HUBBELL when they could see their children. HUBBELL stated that this was not possible at this time and hung up. CHELSEY, with the help of the older sibling and with knowledge of HUBBELL, accessed CHELSEY'S bank account and withdrew the majority of the money from the account. The older sibling was then given permission to sign the consent form authorizing Driver's Ed, further denying RON and LINDA'S participation in CHELSEY obtaining a driver's license.

54.     Following this hearing, on September 20th, Colten was forced to leave his current High School and required to enroll in Random Lake High School. The parents had no knowledge of this until sometime in late October. This was done in violation of the family's fundamental right to direct the education and upbringing of their children. The parents were not notified nor consulted in this decision, nor was their attorney. When discovered, the parents were told that Colten's school transfer was more convenient as it was closer to the older sibling's home. RON and LINDA objected to this transfer as Colten had been enrolled in Port Washington School system for the past 4 years. This move further isolated him from his established friends and teachers. This was detrimental to his education. Colten, with his parents and the school, had established a 4 year plan that would fulfill Colten's Graduation

16

Requirements, and since adoption, he had excelled and achieved the honor roll while he lived with his adoptive family. The Random Lake School system did not offer the standard of excellence that the Port Washington School district did, nor did it offer the class options. HUBBELL and DHS refused to consider Colten's continuation at Port High. The day after he was removed he broke down inconsolably at school. He asked a teacher "why won't a mother love me?" and told the school counselor that he was informed that his mother (LINDA) hated him. LINDA denies ever stating that she hated him. This was obviously false. This was all part of the older sibling's malicious purpose to separate Colten from his parents.

55.     On September 21, 2010, CHELSEY was taken to a Clinic in Random Lake by the older sibling, with the knowledge and consent of HUBBELL, due to CHELSEY having dizzy spells. After a thorough examination, by a Nurse Practitioner, without consulting with any primary physician, under no care of a psychotherapist, with NO parental consent or knowledge, CHELSEY was given a flu vaccine, vaccinated for HPV, given birth control pills (although up until this point she had not considered being sexually active), allergy medication, and then dispensed Prestiq (psychotropic medication which is not recommended for anyone under the age of 24, and is used to treat MAJOR DEPRESSION). No Medical consents were signed nor ordered by the court. This physical examination was performed with knowledge and permission from HUBBELL. LINDA and RON had a right to be present at medical examinations of their children, or to be in the nearby area if there was a valid reason to exclude them. *Grene v. Camretta,* 388 f.3d 1011, 1037 (2009). This examination was conducted without the consent of RON or LINDA, without a warrant or court order authorizing the examination, and in the absence of exigent circumstances. RON and LINDA were totally unaware of the medical examination, the need for an examination, even the dispensing of vaccines and medications of

17

CHELSEY, and were not permitted to be in close proximity as required by law. Nor were they allowed the opportunity to comfort or discuss medical treatment with CHELSEY either during or after the medical examination was completed. This was all done in the absence of any exigency and without any court order or warrant. The children's family physician was never notified or consulted. This examination was scheduled in the continued fishing expedition launched by the defendants and the older sibling to find a basis for removal which was never found.

56. On the 1st of October, the parents, through their attorney, requested a meeting with new case worker, FEIERTAG, and Corporation Counsel Dennis Kenealy. At this meeting, Corporation Counsel clarified that there was never a court order prohibiting contact between the parents and their children, and did not see a problem with communication between them. FEIERTAG misrepresented to everyone that the children did not want to talk to their parents on the phone, over the computer, or by texting, and that the only contact that the children requested and therefore would be approved by Social Services was by letter. This information was false and misleading and designed to keep the children isolated from their parents. That at this meeting, Corporation Counsel also questioned FEIERTAG why the children were removed. FEIERTAG replied that the children had stated that they had thoughts of running away in the past. Corporation Counsel and all parties, with the exception of FEIERTAG, agreed that when children do not like the rules, they all threaten to run away at some time. If children were removed children for that reason, all children in the county would be out of their homes. Corporation Counsel Kenealy stated that this is not a proper basis to seize children.

57. During the meeting, RON and LINDA requested visits with their children. FEIERTAG told them that the only way that she would approve of visits, was within the context of therapy. Corporation Counsel directed that family counseling should begin ASAP, and if

18

recommended by a counselor that the children could be referred to individual counseling. RON and LINDA were then informed that their son was in a different school and needed funds for a Basketball uniform and shoes. This is when RON and LINDA first learned that Colten had been relocated to a different high school. They objected, and their objections went ignored. They realized that this would be the end of Colten's quality high school education and experience which it was. Without discipline, boundaries and encouragement Colten was doomed to fail. Dennis Kenealy then further gave permission for contact. Visitation would only be discussed after the first counseling session. FEIERTAG warned RON and LINDA that they were prohibited from discussing the case, school, future events, or anything controversial. It took Social Services two weeks to approve this request for counseling and to schedule same, thereby delaying contact with the parents. FEIERTAG and Corporation Counsel did not disclose CHELSEY'S medical appointment or medications or scheduled dental appointments. Instead, FEIERTAG ordered that RON and LINDA schedule unnecessary Doctor and Dental appointments, as if the parents were ignoring the health of their children. Again this was done to pad the file in an attempt to justify the illegal removal of the children.

58. On October 3, 2010, SHANNON took more requested items to CHELSEY and Colten. The older sibling still would not allow SHANNON to speak with CHELSEY or Colten. The purpose of the older sibling was to alienate Colten and CHELSEY from their parents. FEIERTAG failed to contact the older sibling provider to inform them that RON and LINDA had permission to contact the children. The older sibling continued to prevent phone calls between children and parents. FEIERTAG finally contacted the older sibling after RON and LINDA had no contact with their children for 27 days and the children had become distant and

19

non-communicative due to the older sibling's indoctrination of the children and alienation against the parents (RON and LINDA).

59. Parents, RON and LINDA, eagerly texted CHELSEY'S phone as permission had been given by Corporation Counsel. RON and LINDA'S text to CHELSEY was that they missed her and loved her, and to let Colten know the same. RON and LINDA were then contacted and threatened by the older sibling. The older sibling stated she would contact the police and Social Worker FEIERTAG if there were any further attempts by RON or LINDA to contact the children by texting. The older sibling did then contact FEIERTAG and told her that the parents had disturbed CHELSEY on her "special" day of Homecoming. CHELSEY did not have her phone at this time and the older sibling was using it to monitor any possible contact and to further isolate both CHELSEY and Colten. RON and LINDA had always shared in these "special" days with their children; the preparations, transportation, and picture taking.

60. On October 7, CHELSEY and Colten were taken to a dentist without the parents' knowledge or consent and no court order. They had no cavities and were told to brush and floss more. This again was an attempt to build a case against the parents where none existed.

61. That on October 8, 2010 a plea hearing was held with regard to the CHIPS petition, at which time the children had been barred from their home for approximately a month. The parents entered a plea of not guilty to the false allegations contained in the CHIPS petition and a trial date was set. Following the hearing FEIERTAG approached LINDA about whether she had scheduled a Dentist and Doctor appointments for the children. FEIERTAG did this knowing full well that both children had secretly been seen by a Dentist the day before. FEIERTAG of course failed to disclose this. FEIERTAG also knew CHELSEY had been seen

20

and given medications at the Random Lake Clinic without knowledge or consent of her parents. FEIERTAG's purpose was to manufacture evidence against the parents.

62.    On October 20, 2010, RON and LINDA finally had their first Family Counseling Session with CHELSEY and Colten, and after 42 days of forced separation and no contact, RON and LINDA were finally permitted their first face-to-face contact with their children.  Before this counseling session both parents met with SUPERVISOR BALLOS.  RON and LINDA asked what they had done wrong.  BALLOS responded that she could not discuss this with the parents, as they had an attorney.  BALLOS said, "You must have done something wrong," and "you need to apologize to your children."  At this first therapy session, the children came with speeches that were prewritten under outside influence indicating that they did not want to come home.  These were not the same children who were seized six weeks earlier.  The children acted completely different than they had acted prior to the removal.  Their relationship with their parents had been purposely and severely damaged.  During the period of separation the children were instructed that continuing to live with their parents was detrimental to their future.  The children were encouraged to resist and fight returning to live with the parents.  Per the children, both HUBBELL and FEIERTAG, as well as the older sibling, had told them that they were never returning home.

63.    On November 2, 2010 (3rd contact with daughter in 55 days), LINDA was allowed to accompany CHELSEY to Dr. Lesko for a well visit.  FEIERTAG failed to inform LINDA or the Doctor about CHELSEY's prior Clinic visit, or any medications that she was currently taking, thereby potentially endangering CHELSEY'S health.  Social Worker FEIERTAG allowed LINDA to meet CHELSEY (but would not allow LINDA to drive CHELSEY), at a restaurant (with FEIERTAG) for lunch.  After LINDA and CHELSEY got their

21

food and sat down, LINDA hugged CHELSEY, and told her how much she loved her and missed her. She asked CHELSEY why she did not ride to the restaurant with her. CHELSEY said she did not think she was allowed to. LINDA then asked CHELSEY when she was coming home, and both CHELSEY and LINDA teared up, and CHELSEY shrugged. This interaction was later reported by FEIERTAG that when LINDA asked her daughter when she was coming home that LINDA was intimidating her and looked angry. LINDA later informed FEIERTAG that she was not angry with her daughter, what FEIERTAG saw was a broken heart. This visit was reported negatively by FEIERTAG and used to prevent further contact.

64. On November 8, 2010 (3rd contact with Son in 61 days) LINDA was allowed to accompany Colten to the doctor for a well check with FEIERTAG. When LINDA approached the desk to sign-in, she was informed by the nurse that Colten's residence had been changed to that of the older sibling. LINDA was further humiliated as the staff knew her and asked what was going on; LINDA was not allowed to reply under penalty of further sanctions by the defendants. While waiting to be called in, LINDA asked Colten for his cell phone number. Colten said he was "not comfortable" with that. Linda asked Colten to call her, he said he was "not comfortable" with that. He also was "not comfortable" that a signature was needed from LINDA or RON on the paperwork to participate in the sports program at school. By this time the brainwashing by the defendants and the older sibling was beginning to take hold. While Colten was seeing the Doctor, LINDA discussed with FEIERTAG that this was not right. LINDA asked why her children had been removed. FEIERTAG stated "it's in the report," and "you must have done something." LINDA also talked with FEIERTAG about CHELSEY and Colten's religious education classes that were due to begin soon. SHANNON had been confirmed last year, and CHELSEY's confirmation classes and retreat were this year, Colten had

22

his regular classes. The family was actively involved with the local parish, St. Mary's. Both SHANNON and CHELSEY and Colten had their first communions there. The entire family volunteered during the church festival and during services. FEIERTAG said that they would not be able to accommodate that as they did not have the resources to provide transportation and it would be too much effort for the older sibling as the children already required too much transportation. LINDA offered to provide transportation which was refused. These actions seriously impacted the religious education being provided by the parents. LINDA also provided FEIERTAG with papers from Colten's adoption in the hopes that FEIERTAG would further investigate the wrongful removal. FEIERTAG said that she would have to discuss this with her supervisor but the parents received no follow up.

65. On November 12, 2010, a status hearing took place, with a Permanency Plan prepared and filed by FEIERTAG (signed by FEIERTAG and SUPERVISOR BALLOS). FEIERTAG filed the Permanency Plan in the court in support of keeping CHELSEY and Colten in foster care and away from their family and home. The report to the court contained material and substantial misrepresentations of fact, and excluded relevant information. DEFENDANT FEIERTAG knowingly and intentionally gave false information to the court with the expectation that the court would rely on this information in issuing an order authorizing the continued seizure of CHELSEY and Colten. FEIERTAG'S verified petition contained statements that were false, either directly or by omission of critical exculpatory facts. FEIERTAG did not care whether the allegations were true or false, and made no effort, herself, to find out or otherwise investigate the truth of the matters stated, thereby demonstrating a reckless or callous indifference to the rights of PLAINTIFFS and of her duty to tell the truth. FEIERTAG'S report contained the same false and misleading information as stated on the original CHIPS Petition. Intentionally left blank was

23

any mention of Children's Dental visits, or their prior Doctor/Clinic visits or list of CHESLSEY'S current medications.

66. FEIERTAG also prepared and filed a CASE PROGRESS EVALUATION, SAFETY ASSESSMENT AND CASE CLOSURE report, signed by both FEIERTAG and SUPERVISOR BALLOS. These reports (both children's were the same), also included under CHILD FUNCTIONING; Child shows no effects of maltreatment, such as serious emotional symptoms and lack of behavioral control and Child shows no effects of maltreatment such as serious physical symptoms. Under Section II. PARENT/CAREGIVER PROTECTIVE CAPACITIES (ADULT FUNCTIONING AND PARENTING PRACTICES): the following answers were given in response to specific questions. NO, One or both parents cannot control behavior; NO, One or both parents are violent; NO, There is some indication parents may flee; NO, One or both parent intend(ed) to hurt the child; NO, Child has exceptional needs which parent cannot/will not meet; NO, No adult in the home will perform parental duties and responsibilities; NO, One or both parents fear they will maltreat child and/or request placement; NO Child is seen by either parent as responsible for the parent's problems; NO Parents do not have resources to meet basic needs; NO, Living arrangements seriously endanger the physical health of the child. When specific questions were asked it was clear there was no basis for removal and the children had been in no danger.

67. The report prepared by FEIERTAG further states that "Ron is not always involved in discipline, as he does not live in the home." "Ronald does not participate fully in parenting, as he does not live in the family home. It is reported by several people that Ron sides with the children when they are alone, but sides with Linda when she is present. Ronald has not been able to protect the children but has stated to other family members that he is aware they are

24

not being treated appropriately by LINDA. Currently RON denies that there were issues in the home and maintains loyalty to LINDA." And as to LINDA it states "It is unknown Linda's mental status right now, as she will not consent to any services, other than family counseling. It is reported that Linda drinks alcohol frequently, but does not seem to be an alcoholic. It was also reported that Linda used to do drugs, such as cocaine." "Linda has been involved with the Department in the past, when her now 31 year old daughter (the older sibling who instigated the investigation) was a teenager. It does not appear Linda has benefited from the services to her at that time and she has not accepted services the Department has offered more recently other than family counseling." "Linda utilizes different methods of discipline. Linda reports grounding the children depending upon what they did for either a few hours or a few days or until their chores or school work is done. However, Linda has also withheld food, called the children names, not allowed them to see friends for weeks or months at a time, slapped or punched and made the children go to bed early without dinner for discipline. Linda has unrealistic boundaries and expectations of her children and then follows through with inappropriate discipline techniques. It is reported that she makes the children re-wash the dishes several times if they are not clean enough, she has made Colt do several hundred push-ups at a time, and keeps the children up late at night until they do their homework to her satisfaction. When it is discussed about her discipline, she denies inappropriate behaviors." "Linda is not consistent with her parenting. Linda is more nurturing and affectionate with her daughters than she is with her adopted son, whom she does not nurture at all. It is reported that Linda has stated to several people that she does not love and she hates her adopted son. It is reported that the children feel they are walking on eggshells when it comes to their relationship with Linda because they "never know what she will do." It appears Linda has difficulty in empathizing with her children and is rigid and

25

controlling in her interactions with the children." "Linda does provide for the children's basic care, however, she also makes the children buy their own personal needs items such as clothing, underwear, shampoo and feminine hygiene products." These false allegations represent the malice from the older sibling and distortions from the children's original interviews. These were now being presented as fact by the DEFENDANTS in contradiction of this same report identifying *CHILD FUNCTIONING* and *PARENT/CAREGIVER PROTECTIVE CAPACITIES (ADULT FUNCTIONING AND PARENTING PRACTICES.* None of the Defendants had ever asked parents about about any of these false allegations based upon unsubstantiated statements of the older sibling which were never investigated.

68. Had DHS investigated at all, rather than just accepting the older sibling's biased hearsay allegations, they would have discovered that an extensive 6 month + home study had been completed in 2007 by Bethany Christian Services in order to adopt Colten to his "forever home." This investigation included a complete family criminal background check, including drug and alcohol tests and assessments, Doctor appointments to verify the health of all, vaccinations all up to date, including all pets, TB tests, a letter from Linda's Oncologist that she was not going to die within the next 5 years, and references from people who had maintained a close relationship with the family. The results of HOME STUDY BY KIPPI BEDNAR FOR BETHANY CHRISTIAN SERVICES included;

    a. "Colt appears well adjusted in the Chalmer's household and shows significant bonding with all the family members."

    b. "Tae Kwon Do. Wood working skills with Ron. Normal sibling relationship with Shannon and Chelsey, which includes typical rivalry as well as good times."

    c. "Colt's ADHD symptoms are handled in a direct and structured manner from the Chalmers which seem to help Colt utilize more self-control and accountability. Along, with the important structure and routine that Colt can count on, is a good deal of relaxed and recreational time with the family. Overall, Linda and Ron see the strengths and

26

potential growth in Colt and see it their job to assist Colt in becoming all that he can be."

d.  "Linda and Ron showed a commitment from the beginning of Colt's placement to provide a nurturing, supportive home for him."

e.  "Linda presents as a self-assured and goal-oriented woman.  She is very creative and artistic and this talent is reflected in her home interior.  In addition, she has an interest in graphic arts, architecture, design, reading and music.  She also enjoys spending relaxed and recreational time with her family."

f.  "Linda reports that her independent job position, both at "Wind Song", and with Coldwell Banker, allow a great deal of flexibility in which her children can join her at times or she can work out of the home.  Ron works 40 plus hours per week with his General Contractor position."

g.  "Ron presents as a caring and devoted man.  He participated easily in the interviewing process and demonstrated a commitment to the adoption process.  His occupation is general contracting and his skills with wood working is evident in the various projects he has created…. He also enjoys his recreational time with the family."

h.  The family works together in completing household chores and tasks.  The children take turns doing routine jobs for upkeep around the house.  For bigger projects, such as yard work, everyone in the family pitches in."

i.  "The family spends time boating, fishing, and waterskiing during this vacation.  The children are also artistic, musical, and skilled with crafts, so family activities center around this as well.  The family is active in St. Mary's Church in Port Washington.  The family volunteers their time with church clean-up and other activities.  All of the children attend confirmation classes, in addition to Sunday service."

j.  "Ron and Linda have completed the Special Needs Class training requirement.  They were noted as having full participation in this class.  In addition, it was reported from the class evaluation, that they have realistic understanding of special needs.  They have worked closely with Waukesha County Human Services during this foster care placement to ensure Colt's needs are being met.  Linda and Ron have seen overall progress from Colt with their implementation of consistency, structure, and emotional support."

k.  "In the area of History of Child Abuse/Neglect, there are no concerns for Ron or Linda in this area.  No records indicating reports of abuse or neglect from the Ozaukee County Depart. Health/Family Services were provided."

l.  "Linda and Ron have been noted by all of their personal references as having positive characteristics.  Some of these attributes include; "responsible, active, compassionate, involved, hardworking, happy, and flexible."  Through observation, and interviewing this worker confirms that these qualities do exist with Ron and Linda.  The comments noted from the references are from individuals whom have had an on going relationship with

the Chalmers for more than 17 years. In gathering information and observing the Chalmers household it is apparent that Ron and Linda invest themselves fully into their children's well-being. Ron and Linda demonstrate a commitment in interpersonal relationships in their careers and in their goal to help develop each of their children's individual strengths. They both have taken lessons from their own childhoods and developing years and turned negative circumstances into positive changes for themselves."

m. "Ron and Linda clearly demonstrate that they are devoted and fulfilled in their marriage relationship. They report they respect each other and work as partners in parenting. They show they can give and take in the relationship to support each other's needs and the needs of the children. They both like to humor each other with light-heated sarcasm and appear to be physically affectionate toward each other. They both work hard in their occupations and as responsible parents for the good of the children."

n. "Shannon and Chelsey are Ron and Linda's biological daughters who reside in the home. They are both healthy and well functioning children. Their behaviors are age appropriate and they pose no health risk to themselves or others. They appear well bonded with each other and their parents."

o. "Linda and Ron demonstrate exceptional parenting abilities with Shannon, Chelsey and Colt. They have helped the children develop their individual strengths, learn responsibility and life skills, and pull together as a family."

p. "Ron and Linda have taken an active stance in providing essential resources and opportunities to promote Colt's personal growth. Colt is provided with many opportunities to encourage his personal interest, academic structure, family activities and routines that encourage Colt's permanent position in the home."

q. "In assessing the parenting abilities of Ron and Linda Chalmers, and looking at each family member's individual functioning, it appears that the adoption of Colt into the Chalmers family is appropriate and necessary for Colt. Colt is clearly bonded with the Chalmers and is anxious to call them his permanent family. Ron and Linda show devout love and commitment toward Colt. There are no references returned that noted concerns regarding Ron and Linda."

r. "Linda and Ron have adequately met the needs of Colt that relate to his A.D.H.D. disorder and grief and loss issues centered on his separation from his biological home. They establish age appropriate expectations, nurturing, and enriching learning experiences for Colt. He has progressed significantly under the care of Ron and Linda. Ron and Linda are open to providing any resource required to meet any of Colt's needs."

s. "Ron and Linda are qualified to address Colt's needs. Historically the have appropriately cared for Colt and appear committed to continue to do so."

t. "The Chalmers are successfully meeting the special needs of Colt and will continue to do

28

so. The special needs as identified on the Matching Inventory, specifically A.D.H.D. related, academic needs, emotional support, and contact with biological family/significant others are already being addressed appropriately. Linda and Ron Chalmers have been consistent in meeting all of Colt's needs, therefore it is safe to predict the will continue to do so as his legal parents. The Chalmers appropriately address all the needs of Colt." Signed and dated 12/31/2007 (Began 5/23/2007)

69. CHELSEY and Colt appeared in the hearing with their attorneys. They were told to not have any eye contact or speak with parents, therefore they would not look at RON or LINDA, and backed away from contact. The older sibling was there to state her wishes to take the children out of the county for numerous dates including those of the holidays while parents were denied their traditional holiday preparations and celebrations. This was part of a continuing scheme to alienate the children from their parents.

70. After this hearing, FEIERTAG, BALLOS, parent's attorney, and LINDA met in a courthouse conference room to discuss and clarify why the children were removed. BALLOS stated that this was a "Family Feud" and that it would be determined at Fact Finding. At this time it should have been clear to all defendants that the older sibling was using the defendants to further her own agenda. Until then, DHS would not discuss other arrangements for visits or discuss the children going home. This proved the Defendants were aware they had placed the children in a foster setting hostile to the parents' relationship with their children.

71. Despite requests for a trial on the merits, the Defendants delayed and continued to postpone the trial. During this time period the parents were deprived of their children and their contact with them was extremely limited and under difficult circumstances.

72. In complete frustration, RON and LINDA requested and met with SUPERVISOR BALLOS and SOCIAL WORKER FEIERTAG on November 17, 2010, to discuss concerns regarding lack of visitation and deliberate alienation from the family. The parents asked for

29

clarification as to why their children were removed as there was no reason. SUPERVISOR

BALLOS stated that this could not be discussed as RON and LINDA had an attorney, and stated

that it would be disclosed during the Fact Finding (jury trial). RON and LINDA stated that

procedures had not been followed with removing the children, that "reasonable efforts to prevent

removal of the children from the home" were not made, that RON and LINDA were never

offered services, so therefore did not "refuse services." That, as a matter of fact, from initial

contact on July 6, 2010 until the day Social Worker appeared at PETITIONER'S home on

September 8, 2010 informing then that their children were placed in foster care, RON and

LINDA had NO contact, in person, or via phone or mail from DHS discussing concerns or

offering services. The family was experiencing no crisis in their home at the time of removal,

and was only planning on taking Colten to a baseball game that night.

       73.    Supervisor BALLOS stated that she believed that the Defendants acted correctly,

and that having an attorney, impedes normal procedure. RON and LINDA asked again why

Family Interaction Standards were not being followed, that the purpose of family interaction is to

preserve and strengthen family relationships to lead to reunification. RON and LINDA did not

have contact with their children within 5 days of removing them from their home as was State

mandated. The parents were still were not having the minimal face-to-face family interaction that

MUST occur no less than weekly. FEIERTAG and BALLOS both informed RON and LINDA

that they cannot MAKE the children contact parents via phone, text, etc., that it is the children's

choice as to whether or not to answer their phones and whether they want face-to-face

interaction. BALLOS told the parents that in Wisconsin children over the age of 14 have the

right to make these decisions themselves, and can only be ordered to act otherwise when the

judge so orders with a disposition order. A Disposition hearing would not happen until after Fact

Finding Hearing. BALLOS further stated that there are **exceptions** in certain cases when DHS does not need to follow these procedural guidelines. The parents expressed concerns that the foster home chosen by Defendants was alienating their children from them and that if the family was to have a chance at reunification that their children needed to be moved to a neutral placement. BALLOS stated that this was not possible unless something extreme was to occur.

74.    On November 21, 2010, CHELSEY confided in LINDA that she was on anti-depressants and had been since being seized. LINDA and CHELSEY discussed how dangerous this was and LINDA sent her information on prescribed drugs. LINDA was concerned because this drug is known to cause suicide attempts. LINDA then contacted the family Doctor, Dr. Lesko, who shared those concerns, and was horrified and upset that he had not been informed, either by DHS or the Random Lake Clinic who was part of the same Aurora practice. Dr. Lesko immediately wrote a letter to CHELSY telling her he wanted her OFF of the anti-depressants and that he did not agree with psychotropic medications for children. LINDA also contacted HAUPT (DHS Director) and BALLOS. They both concurred that CHESLEY would be moved to a different foster home as her health and familial relationship was being jeopardized. When BALLOS discovered that HUBBELL had given permission for the medications (but forgot to include it in her notes), and FEIERTAG had knowledge of the medications but did not disclose it to anyone, BALLOS decided it was better to leave CHELSEY where she was and removed FEIERTAG from the case to be replaced with Social Worker QUAM. PLAINTIFFS believe that this was in part because FEIERTAG was starting to question whether removal was indeed justified and the motives of the older sibling. BALLOS also informed RON and LINDA at this meeting, that they would not give permission for the Cedarburg Police Sergeant to transport and supervise their children so that they could be home for Thanksgiving (parents had been told that

31

DHS had no one who could supervise visits on holidays). BALLOS said the police sergeant had not been cleared with a background check. The family was again denied all traditional holiday celebrations, through the end of the year and into 2011. This was done to prevent any reunification of the family.

75. Repeated pleas to DHS Director HAUPT from parents, family and friends to further investigate and examine the case went ignored. LINDA then called the State DHS office in Madison and spoke with Case Manager Connie (LNU), explaining the situation to her, the lack of visitation, the lack of reasonable efforts being made and that parents did NOT abuse or neglect their children. The State DHS manager contacted BALLOS immediately to question her about the case. BALLOS falsely told her that visits had been court ordered. On November 23rd, BALLOS informed LINDA that she could "call whoever you want, including the president, but it will not change your situation or bring your children home at this point." Ballos was going to win regardless of the effects on the family. BALLOS further told LINDA that her actions showed lack of empathy for her children. LINDA was told that she was proving that she was "controlling" and "manipulative" and was trying to "triangulate." This was BALLOS' attempt to discourage LINDA from trying to reunite her family.

76. By this time in December, CHELSEY had lost her job due to not having timely transportation, and she was forced to give up her position as an *Explorer*, because she was no longer in Port Washington and could not respond to calls or attend mandatory weekly meetings regularly. Colten was failing at school and had missed over 50 days. He no longer had an interest in Civil Air Patrol. Linda was allowed to take CHELSEY for an eye check up in early December. By this time the alienation and destruction of the family was having serious and permanent effects on the children. CHELSEY had her fists clenched in the car and was very

32

quiet. When LINDA stopped the car and asked CHELSEY what was wrong, CHELSEY broke down and said "You didn't save me." LINDA told her she was SO sorry, they desperately wanted to come and get her after she was taken by DHS, but if they had tried, they would have been arrested. LINDA stated that she and RON had done and were doing everything they could to put their family back together. CHELSEY said she had been told that her parents did not love her or they would have admitted guilt in court and got on with it. Because LINDA broke down crying at this exchange, further unsupervised visits were cancelled.

77.    Both CHELSEY and Colten were frustrated and requested that LINDA and RON just admit that every parenting decision they made was wrong and abusive. This is the result of the indoctrination of the children by the defendants and the older sibling. In response to this programming the children responded to their parents, "they wouldn't have removed us if you didn't abuse us!" The parents continued to ask "how did we abuse you?" Parenting was undermined, and any response from parents other than total acquiescence was met with defiance. Colten continued to become increasingly hostile and defiant. The parents therefore repeatedly asked DHS for individual separate therapy for Colten, along with the Family Therapy with CHELSEY and Colten. Each request was met with denial.

78.    Beginning in January 2011, the family finally had a regular supervised visitation schedule. Tuesdays three hours with CHELSEY, and Thursdays three hours with Colten. By the middle of February, the visiting supervisor was shaking her head saying "I just don't understand why your children are not home?"

79.    In mid January RON and LINDA requested and received ALL of the paperwork from their case. They were appalled when they discovered that all of the Defendants had all the truth from the beginning and yet they chose to continue to continue to lie to the both the parents,

the court and to the children.

80.    These files included the notes from the children's interrogations on September 7, 2010. Nowhere in their interviews did CHELSEY or Colten suggest they wanted to run away, only that they had thought of running away in the past if they were angry with their parents about something. Colten said that yes, mom called him names, but he could not remember a specific incident. CHELSEY said that she had a chipped tooth of which she had not as yet taken her to the dentist (this was not bothering her at the time, nor was it noticeable). Colten said that he had not been to the Doctor yet that year, that he did not like having to do homework after school everyday, there were several times that when he came home LINDA failed to leave the door unlocked and he had to wait outside. This had not happened for a few years, and then it was only once or twice for a few minutes. CHELSEY said that she was upset that mom did not let her go downtown for coffee with her friends one day, and she had to walk six blocks because mom would not always give her a ride. There was nothing that suggested abuse or neglect in those interviews, and certainly NOTHING that would suggest that they were in any kind of imminent danger that would require immediate removal or removal at all. Neither child asked to be removed, or suggested that they were in any way in danger or fearful to be home. This was prior to being programmed by the older sibling, and supported by their continuing out-of-home placement. Had any of the defendants discussed these comments by the children with the parents it would have been clear the children were in no danger.

81.    And so, RON and LINDA kept asking the social worker(s) "why aren't our children back home? What exactly are we being charged with"? The Parents had always taken their children to the doctor as required. All their children were healthy. The children's dental hygiene was always maintained. The parents did not take any drugs stronger that Advil or have

34

any alcohol issues. The parents did not have anger issues. The parents did not argue in front of the children. The parents did not hit their children. The parents did not in any way abuse their children.

82. At the February 11, 2011 hearing, a six month PERMANENCY PLAN was prepared and filed by QUAM (signed by QUAM and BALLOS). The report intentionally failed to identify any positive interactions or strengths of the parents or family. QUAM filed a Permanency Plan in the court in support of keeping CHELSEY and Colten in foster care and away from their family and home indefinitely. The report to the court contained material and substantial misrepresentations of fact, and excluded critical exculpatory relevant information. QUAM knowingly and intentionally gave false information to the court with the expectation that the court would rely on this information in issuing an order authorizing the continued seizure of CHELSEY and Colten. QUAM'S verified petition contained statements that were intentionally false, either directly or by omission of critical exculpatory facts. QUAM did not care whether the allegations were true or false, and made no effort, herself, to find out or otherwise investigate the truth of the matters stated, thereby demonstrating a reckless or callous indifference to the rights of PLAINTIFFS and of her duty to tell the truth. QUAM'S report contained the same false and misleading information as stated on the original CHIPS Petition, and prior *Permanency Plan* prepared, verified and filed by FEIERTAG and signed by BALLOS. It again intentionally omitted CHELSEY'S current medications.

83. By the first week of March, CHELSEY had had enough of this charade, she wanted her life back and wanted to come home. CHELSEY was so adamant about being home that she was going to refuse to leave her home after a home visit. RON and LINDA were then told that CHELSEY could not come home permanently unless RON and LINDA agreed to

35

terminate the parental rights of Colten. The DEPARTMENT and Social Workers conspired, using CHELSEY to blackmail her parents. Even though QUAM agreed that Colten belonged with the parents, and did not like the foster placement, QUAM'S supervisor BALLOS later over-ruled QUAM. RON and LINDA understood that as long as Colten remained in the foster placement home with active alienation and brainwashing that they stood no chance of convincing Colten to come home. Colten needed to be moved to a neutral home if the RON and LINDA stood any chance of reconciliation, Quam promised that she would support this.

      84.    At the March 11, 2011 Status hearing, QUAM prepared and filed a CASE PROGRESS EVALUATION, SAFETY ASSESSMENT AND CASE CLOSURE report. This report was prepared and filed by QUAM (signed by QUAM and SUPERVISOR BALLOS). The report failed to identify any positive interactions or strengths of the parents or family. QUAM filed this report in the court in support of keeping CHELSEY and Colten in foster care and away from their family and home indefinitely, even though she had verbally agreed otherwise. Clearly Ballos had forced her to stay the course of permanent removal. The report to the court contained material and substantial misrepresentations of fact, and excluded relevant information, including the fact that CHELSEY wanted to come home, or any recommendations for Colten. QUAM knowingly and intentionally gave false information to the court with the expectation that the court would rely on this information in issuing an order authorizing the continued seizure of CHELSEY and Colten. DEFENDANT QUAM'S verified petition contained statements that therein were false, either directly or by omission of critical exculpatory facts. QUAM did not care whether the allegations were true or false, and made no effort, herself, to find out or otherwise investigate the truth of the matters stated, thereby demonstrating a reckless or callous indifference to the rights of PLAINTIFFS and of her duty to tell the truth. QUAM'S report

contained the same false and misleading information as stated on the original CHIPS Petition. Again excluded any mention of CHELSEY'S current medications.

85.     These reports (both children's were the same), included the EXACT same information as the report that was filed by FEIERTAG, signed by BALLOS, filed in the court in November 2010, which was based on lies and exaggeration presented to fraudulently remove the children on September 8, 2010.  When asked specific questions it was clear that there was no mistreatment of the children.  CHILD FUNCTIONING; Child shows no effects of maltreatment, such as serious emotional symptoms and lack of behavioral control and Child shows no effects of maltreatment such as serious physical symptoms.  Under Section II. PARENT/CAREGIVER PROTECTIVE CAPACITIES (ADULT FUNCTIONING AND PARENTING PRACTICES): NO, One or both parents cannot control behavior; NO, One or both parents are violent; NO, There is some indication parents may flee; NO, One or both parent intend(ed) to hurt the child; NO, Child has exceptional needs which parent cannot/will not meet; NO, No adult in the home will perform parental duties and responsibilities; NO, One or both parents fear they will maltreat child and/or request placement; NO Child is seen by either parent as responsible for the parent's problems; NO Parents do not have resources to meet basic needs; NO, Living arrangements seriously endanger the physical health of the child.

86.     The hearing was brought to a halt as Corporation Counsel stated that there had been a change - CHELSEY wanted to return home.  Judge Sandy Williams told the attorneys to get it worked out and let her know by April 8th if "fact finding" was to remain scheduled for April 15.  She further stated that if a resolution could be made before that date that she was fine with CHELSEY going home and to informally let her know.  CHELSEY'S attorney and Corporation Counsel neglected to get anything together until 10 minutes before the hearing on

37

April 8th.

87.     On April 8, 10 minutes before the hearing was to begin, Parents were presented with **two** consent decrees for signature at that time.  For CHELSEY: that she would have a transitional return with being home permanently by April 29th, continued individual counseling as well as family counseling, and 6 months continued supervision by CPS, and there was no admission of guilt by parents.  Although parents objected to the "transitional return", they desperately wanted her home NOW, so they reluctantly agreed.  Then to the parent's shock, they were presented with a document requiring consent to the termination of parental right of Colten and transferring guardianship to the deceitful older sibling who had alienated Colten from his family.  The parents were told CHELSEY would not be coming home if they did not agree to this. This was not what was discussed with the parents prior to the hearing.  When confronted with this and questioned, QUAM said that while she did not agree with it there were no other options.  Her supervisor MARION BALLOS had over-ruled her determined to win at all costs. Corporation Counsel told parents that the process of terminating parental rights to Colten would take at least six months.  Being totally coerced and intimidated and wanting CHELSEY back, the parents signed feeling they had no other choice.  Colten did agree to continued family counseling with parents despite the programming by the older sibling.  The parents hoped that if they could get CHELSEY home, that they could then focus on getting Colten home before the termination of parental rights became final.  At the hearing, before signing the document allowing the termination of  parental rights to Colten, LINDA approached Colten to ask if he was sure this is what he wanted, to suggest continued family counseling, and to tell him that no matter what she still loved him.  LINDA was told aggressively by Colten's attorney to "stop talking to my client," and LINDA moved away as a security guard approached.

88.     All home visits and contact was denied with Colten after that hearing. Colten reluctantly participated in two family counseling sessions and then, based upon coaching, refused to attend those also.

89.     As April 29th approached, the older sibling pressured CHELSEY to resist going home. QUAM and BALLOS also worked to prevent enforcement of the court order. CHELSEY was brought home by the police on May 5th despite both QUAM'S and BALLOS' attempts at intervention.

90.     The summer progressed fine with the family readjusting. CHELSEY had some problems assimilating back to a routine, but progress was being made.

91.     At a review hearing on July 3, 2011, QUAM again, as usual, filed the same egregious, erroneous reports as she had done previously. The CASE PROGRESS EVALUATION, SAFETY ASSESSMENT AND CASE CLOSURE was the same as had been originally filed by FEIERTAG in November 2010 and based on the same lies and exaggerations that were presented to justify initial removal, with the exception of the inclusion of updated negative information regarding CHELSEY. It would seem that QUAM was most angry that parents had defied QUAM'S personal desires and brought their daughter home per court order.

92.     This hearing had different results. The parents were prepared with written Objections to address the egregious lies and exaggerations that the defendants had asserted. QUAM appeared with Corporation Counsel Kenealy. The defendants could not dispute the facts presented. Judge Sandy Williams admonished QUAM for the irreparable damage she had done to this family.

93.     QUAM left the hearing angry, and the first opportunity she had, she struck again. On September 10, 2011, CHELSEY left parents' home because she was told to go to her room

39

and "cool off." CHELSEY instead chose to walk out the door. Although RON and LINDA were communicating with her via text throughout the night, CHELSEY refused to come home. Around 4pm on September 11, QUAM finally contacted parents stating she took CHELSEY into protective custody earlier that day, and that an officer would be coming to the house with, again, a TPCR. There was no prior consent, there was no court order, without there being exigent circumstances, probable cause, or any evidence of imminent danger, and with deliberate indifference to the rights of PLAINTIFFS, QUAM seized CHELSEY and removed her to a foster placement, again in violation of PLAINTIFFS' rights.

94. LINDA met with QUAM the next day in hopes of clarifying what led up to CHELSEY leaving the home. QUAM listened, told LINDA that she was still removing CHELSEY and would see her in court the next day for the placement hearing. QUAM'S parting remark was with total sarcasm as she said that LINDA'S advocacy work to bring awareness to the public of CPS' egregious tactics was going to lead to more teens attempting to use CPS to get their way and more families will be affected, and that she hoped Linda felt good about that.

95. When all parties appeared in court, Judge Williams put QUAM on the stand under oath. When QUAM admitted that she had not contacted the parents to let them know that she had CHELSEY in custody, and did not offer or understand what "mediation" was to help resolve this situation without this overly aggressive removal, Judge Williams immediately dismissed the case and sent CHELSEY home.

96. QUAM transported CHELSEY to the foster home to claim her belongings, and then dropped her off at the street outside the family home. She did not accompany CHELSEY in.

97. The Petition for Termination of Parental Rights of Colten was signed on

40

September 12, 2011. Parents were forced and coerced into surrendering the child they loved and cared for, and on October 14, 2011, after being threatened, cajoled, and emotionally and financially beaten down, plaintiffs signed the papers to effectuate their surrender, thereby losing Colten forever.

### FIRST CAUSE OF ACTION:
### VIOLATION OF PLAINTIFFS FOURTH AMENDMENT RIGHTS AGAINST UNREASONABLE SEARCH PURSUANT TO 42 U.S.C. § 1983

98.    Re-alleges and incorporates herein by reference paragraphs 1 through 97 above of the plaintiffs' Complaint.

99.    CHELSEY had a right to privacy and security based upon her family interest.

100.    That the actions taken by the defendants constitute a violation of CHELSEY'S Fourth Amendment Rights to Unreasonable Search. That the actions by the defendants in contacting the plaintiffs and Colten constitute an unreasonable search in violation of the plaintiffs Fourth Amendment rights.

### SECOND CAUSE OF ACTION:
### VIOLATION OF PLAINTIFFS FOURTH AMENEDMENT RIGHTS WITH REGARD TO UNREASONABLE SEIZURE PURSUANT TO 42 U.S.C. § 1983

101.    Re-alleges and incorporates herein by reference paragraphs 1 through 100 above of the plaintiffs' Complaint.

102.    That the actions by the defendants as previously alleged in taking CHELSEY into custody were an unreasonable seizure in violation of her Fourth Amendment Rights.

## THIRD CAUSE OF ACTION:
## VIOLATION OF PLAINTIFF FOURTEENTH AMENDMENT RIGHTS WITH REGARD TO PROCEDURAL DUE PROCESS PURSUANT TO 42 U.S.C. § 1983

103.    Re-alleges and incorporates herein by reference paragraphs 1 through 102 above of the plaintiffs' Complaint.

104.    That all of the proceedings that were held in this case as previously alleged violated the plaintiffs' procedural due process rights in that plaintiffs were not afforded adequate notice, that the hearings were not scheduled properly or timely, that there were considerable delays with regard to the hearings, that there were no alternative procedures offered the plaintiffs, and that the plaintiffs family rights and family relations were severely affected.

105.    Additionally at the hearings, there was not an adequate explanation of the charges against the plaintiffs, and there was little or no effort to gather evidence. The hearings were not fair due to a lack of adequate notice.

106.    The plaintiffs were not given an adequate opportunity to contest the charges. That no sufficient evidence ever presented during this entire process at any hearing that would justify the removal of the children from their home.

## FOURTH CAUSE OF ACTION:
## VIOLATION OF PLAINTIFFS FOURTEENTH AMENDEMENT CONSTITUTIONAL RIGHTS TO SUBSTANTIVE DUE PROCESS PURSUANT TO 42 U.S.C. § 1983

107.    Re-alleges and incorporates herein by reference paragraphs 1 through 106 above of the plaintiffs' Complaint.

108.    That the actions taken by the government were outrageous. They resulted in the depravation of the plaintiffs' liberty interest. That the actions taken were arbitrary and wrongfully based upon a failure to investigate. That the defendants failed to follow Wisconsin

42

Statutes, and failed to follow established procedures and practices laid out by both the State and the County.

109.    That the defendants used deceptive tactics in court, suppressed exculpatory evidence, submitted lies in reports filed in court as well as lies in sworn declarations.  The actions of the defendants in this case were deliberate and done in a conscious indifference to the rights of the plaintiffs.

110.    That because of the minimal allegations against the parents in this case, and the substantial family interest that was at risk, the action of the defendants violated the parents' substantive due process rights.

111.    And that based upon the statutes, the procedures in place, and previous case law, there was no qualified immunity.

## FIFTH CAUSE OF ACTION:
## MONELL-RELATED CLAIM

112.    Re-alleges and incorporates herein by reference paragraphs 1 through 111 above of the plaintiffs' Complaint.

113.    At all relevant times defendant Ozaukee County (hereinafter County) including through its Department of Human Services (hereinafter DHS) established and/or followed policies, procedures, customs and/or practices (hereinafter collectively referred to "policy" or "policies") which were the cause of the violation of plaintiffs' constitutional rights including those under the Fourth and Fourteenth Amendment but not limited to:

   a.   The policy of detaining or removing children from their family or homes without exigent circumstances, court order or consent;

   b.   The policy of examining children without exigency, need or proper court order and without the presence of their proper custodian or guardian;

43

c. The policy of removing and detaining children and not returning them, beyond a reasonable period after the basis for detention is negated;

d. The policy of separating siblings without good and just cause;

e. The policy of failing to supervise the safety and needs of children in foster care;

f. The policy of using trickery, duress, fabrication and/or false testimony or evidence and failing to provide exculpatory evidence in preparing and presenting reports and court documents to the court;

g. The policy of failing to adequately investigate claims;

h. The policy of changing, manipulating and exaggerating the statements of children in order to present the appearance of child abuse that is not there; and

i. The policy of failing to properly train its officers, agents, employees in providing the Constitutional protections guaranteed to the individuals including those under the Fourth and Fourteenth Amendments.

114. The defendants, County and DHS, had a duty to plaintiffs at all times to establish implemented policies, procedures, customs and practices which conform and provide for the protections guaranteed under the United States Constitution, including the Fourth and Fourteenth Amendments.

115. The County breached its duties and obligations to plaintiffs, including but not limited to, failing to establish and implement the correct policies and procedures as previously described.

116. The defendants knew or should have known that by breaching the aforesaid duties and obligations it was foreseeable that they would and did cause plaintiffs' to be damaged by their wrongful policies and acts.

117. That these actions or inactions of the defendants are illegal cause of injuries to the plaintiffs alleged herein and as a result hereto plaintiffs sustained general and special damages as

44

well as incurring and continuing to incur attorney's fees, costs and expenses including those authorized by 42 U.S.C. § 1988 to an extent and an amount subject to proof at trial.

## CONDITIONS PRECEDENT

118.   All conditions precedent to this action, within the meaning of Rule 9(c), Fed. R. Civ. Pro., have been performed or otherwise occurred.

## DEMAND FOR JURY TRIAL

119.   The plaintiffs demand a trial by jury of six (6).

**THEREFORE**, the plaintiffs request judgment in the amount of their damages, plus reasonable attorney's fees, plus punitive damages due to the reckless, malicious, and outrageous conduct by all of the defendants.

Dated this 14th day of June, 2013.

> **s/ Daniel W. Stevens**
> Attorney Name Bar Number: 1004632
> Attorney for Plaintiff
> STEVENS & KUSS S.C.
> Centre of Brookfield
> 14380 West Capitol Drive
> Brookfield, WI 53005
> Telephone: (262) 251-5700
> Fax: (262) 251-4894
> E-mail: _danstevens@wi.rr.com_

45